UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THOMAS BURKE, RICHARD DANITZ, ROBERT
J. KULCZYK, JAMES M. KILGER, BRUCE
HOFFMAN, GEORGE FERRARO, JAMES BIDDLE,
SR., JOHN O'HARE, JR., JIM LOGAN, JOHN
SIMMONS, as TRUSTEES on behalf of the
Buffalo Carpenters Pension Fund, and the
BUFFALO CARPENTERS PENSION FUND,

                Plaintiffs,
v.                                          **DECISION AND ORDER**
                                                         09-CV-648S
EATON ASSOCIATES, INC.,

                Defendant.

## I. INTRODUCTION

Plaintiffs in this action are trustees and sponsors of the multi-employer Buffalo Carpenters Pension Fund (the "Fund"), which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*[1] Defendant, Eaton Associates Inc. ("Eaton"), as an employer, was a contributing member to the Fund in late 2001 when the Fund was terminated. At that time, Eaton, along with the other contributing companies, entered into a termination agreement with the Fund that limited its withdrawal liability. The terms of that termination agreement, which were memorialized in a document entitled the "Term Sheet," are at the center of this litigation. Plaintiffs allege that the Term Sheet entitles them to payments from Eaton for the years 2002, 2003, 2006 and 2008.

---

[1] A multi-employer pension plan is a plan to which more than one employer contributes and which is maintained pursuant to collective bargaining contracts between the employers and a union or unions. 29 U.S.C. § 1301(a)(3).

1

Eaton made no payments in those years and now contends that under the plain language of the Term Sheet it owes nothing. But sometime between 2002 and 2008, the parties engaged in settlement discussions concerning debt for the years 2002, 2003, and 2006. Those discussions become relevant because Plaintiffs contend that in 2008 they reached an accord[2] with Eaton concerning this debt, and that later Eaton breached this accord. Each party now moves for summary judgment (Docket Nos. 18, 20), with Plaintiffs seeking enforcement of either the termination agreement or the accord and Eaton seeking dismissal of the claims. For the following reasons, Plaintiffs' motion is granted and Eaton's is denied.

## II. BACKGROUND

There is no dispute that on November 30, 2001, as part of the termination agreement, both parties agreed to the payment plan outlined in the Term Sheet. It sets out Eaton's obligations as follows:

> E. Beginning with the month after the Agreed Mass Withdrawal and with respect to each month thereafter for 180 months, [Eaton] shall pay to the Fund the greater of:
> (1) an amount equal to the product of (a) $3.10 . . . multiplied by (b) each hour worked during the particular month by its employees within the craft and area jurisdiction of the collective bargaining agreement in effect as of the day of the Agreed Mass Withdrawal; and
> (2) an amount equal to the quotient obtained when (a) sixty percent (60%) of the average yearly contribution paid by [Eaton] in the lowest three consecutive years in the ten (10) plan years preceding the day of the agreed mass withdrawal (b) is divided by twelve (12) ("Minimum Payment Obligation").

---

[2]An accord is a contract "under which one of the parties undertakes to give or perform, and the other to accept, in satisfaction of a claim, something other than or different from that which the second party is, or considers itself to be, entitled to." 29 Williston on Contracts § 73:27 (4th ed.) (2011).

(See Eaton Affidavit, Exhibit A; Johnsen Declaration, ¶¶ 8,9.)

When Eaton did not make payments pursuant to the Term Sheet in 2002 and 2003, Plaintiffs sent Eaton a notice of default. (Johnsen Declaration, ¶ 16.) Eaton responded by requesting settlement discussions, but failed again to pay any amount for the year 2006. (Id., ¶¶ 17, 18.) Subsequently, Eaton proposed that it pay $500.00 per month until its debt for these years was paid in full. (Id., ¶ 20, Exhibit J.)  In February 2008,[3] Plaintiffs countered and requested that Eaton pay its arrears at a rate of  $1,014.06 per month, beginning the next month. (Id.) It appears there was no further formal communication between the parties. But, the next month, in March of 2008, Plaintiffs received a check from Eaton's owner, Charles Eaton with a note reading, "This payment [is] towards the N.Y. State Carpenters Fund." (Id.) The amount was $1,014.00, only six cents less than Plaintiff's proposed settlement. (Id.) Plaintiffs believed that Eaton had accepted its counter-offer and therefore sent Eaton a formal agreement meant to memorialize the agreement. Eaton, however, for reasons undisclosed, refused  to sign this agreement, apparently now under the impression that they owed nothing at all. (Id., ¶ 21.) This litigation followed.

### III. DISCUSSION

**A.    Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if

---

[3]There is no indication from either party, except for this date, as to when these settlement offers and/or discussions occurred.

it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

When the parties cross-move for summary judgment, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

**B.    Contract Interpretation Principles**

In adjudicating agreements like these, the Second Circuit has instructed courts to apply "traditional rules of contract interpretation [] as long as they are consistent with federal labor policies." Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., Pratt & Whitney, 230 F.3d 569, 576 (2d Cir. 2000). Further, "New York relies on settled common law contract principles to determine when parties to a litigation intended to form a binding agreement." Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 322 (2d. Cir. 1997); see also Jim Bouton Corp. v. William Wrigley Jr. Co., 902 F.2d 1074, 1081 (2d Cir. 1990) (describing the New York rule of contract formation as "generally accepted"). These principles, including those found under New York law, will therefore guide this Court.

**C.    Motions for Summary Judgment**

Two contractual disputes comprise this litigation: whether Eaton owes any payments under the Term Sheet, and whether Eaton breached an accord in 2008. If the later agreement is enforceable, it would supercede the Term Sheet agreement. For that reason, the alleged 2008 accord will be discussed first.

   **1.    2008 Accord**

Plaintiffs contend that its offer – $1,014.06 per month until the balance was paid – was accepted when Eaton drafted and sent Plaintiffs a check for a nearly identical amount. Eaton argues that it never made such an agreement, pointing to the fact that it did not sign the formalized settlement agreement.

Typically, unless otherwise specified, a party can accept an offer by beginning performance, as Eaton did here by drafting the check. See Restatement (Second) of

Contracts § 30(2) ("Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances"); In re Newport Plaza Assocs., L.P., 985 F.2d 640, 645 (1st Cir. 1993). Indeed, even if the party does not subjectively intend to be bound, if its actions support the conclusion that it has accepted the offer, it is bound to honor the contract. See Dodge Street, LLC. v. Livecchi, 32 Fed. Appx. 607, 611 (2d Cir. 2002) (summary order).

But this seemingly simple conclusion is negated by the specific language of the offer, which precludes acceptance by performance. It is often said that "the offeror is master of the offer." As such, the offeror can dictate the manner of the offeree's acceptance. Farago Advertising, Inc. v. Hollinger Intern., Inc., 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001). Here, in a letter to Eaton, Plaintiffs' attorney wrote, "I believe the Trustees [of the Fund] would be willing to accept payments of $1,014.06 per month with the first payment due March 1, 2008." (Johnsen Declaration, Exhibit J.) Significantly, Plaintiffs' attorney then wrote, "If this is acceptable, please let me know and I will get approval for the Trustees and draft a settlement agreement." (Id.) This renders the purported agreement unenforceable for two reasons.

First, this is a preliminary, qualified offer. Plaintiff's attorney expressed the need to check with his clients before finalization. Second, the language contemplating a formal settlement agreement – which was only to be drafted after Eaton "let [Plaintiffs' attorney] know" – strongly suggests that acceptance could only be achieved, and the agreement would only become final, when Eaton informed Plaintiffs that they had accepted the offer and the settlement agreement was signed by both parties. To be sure, an informal agreement is enforceable even if the parties contemplate memorializing the agreement in

6

writing, see R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir.1984) (citing Mun. Consultants & Publishers, Inc. v. Town of Ramapo, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979)), but it is not evident on the face of this offer that the parties merely contemplated a later writing. On the contrary, it is clear that Plaintiffs' attorney assumed and required that no agreement would become final until the settlement agreement was signed. See Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir.1985) ("If either party communicates an intent not to be bound until he achieves a fully executed document," informal negotiations will not constitute a binding contract). Indeed, even after he received the check from Eaton, Plaintiffs' attorney still sent Eaton's attorney a draft settlement agreement, to be signed by Eaton, thus further demonstrating that he required the formality of a signed contract to render the agreement binding.

Therefore, despite the fact the Eaton sent a check, presumably in response to the offer on the table, such an act, by the plain terms of the offer, was inadequate to effect acceptance.

***

This result means that the Term Sheet, discussed immediately below, dictates Eaton's payment obligations.

### 2. Term Sheet

The parties dispute here concerns the import of one word: "paid." Because there is no dispute that in the years in question Eaton did not employ anyone in the "craft and area jurisdiction of the [agreement]," as found in Section E(1), its payment obligations in those years are instead governed by Section E(2) of the Term Sheet. Section E(2) requires Eaton to pay into the fund the quotient obtained when sixty percent of the *average yearly*

*contribution paid* by Eaton in the lowest three consecutive years in the ten preceding years, is divided by 12. There is no dispute that in the ten years preceding the Term Sheet, Eaton paid zero dollars into the fund for three years consecutively. Therefore, Eaton argues, it owes nothing under Section E(2).

Plaintiffs take a contrary view. They argue that "yearly contribution paid" only includes years when Eaton actually *paid* a contribution, and necessarily does not include years when Eaton made no payments. Under this reading, Eaton would owe over $90,000 under Section E(2).

In support of their position, Eaton first argues that there is no ambiguity and that by the plain terms of the contract, Eaton does not owe any contributions. It next argues that even if there is ambiguity, this Court should apply the longstanding principle of *contra proferentem* – that as the drafting party, any ambiguity should be construed against Plaintiffs.

Plaintiffs seek to apply a different presumption. They argue that the contract should be interpreted in light of the underlying goals of ERISA as amended by the Multi-employer Pension Plan Amendment Act of 1990 ("MPPAA"). Because the MPPAA was meant to protect the interests of participants in financially distressed ERISA plans, they argue, the contract should be construed against Eaton, not the Fund.

As an initial matter, this Court disagrees with Eaton's argument that the phrase in question in unambiguous. From a practical standpoint and without the need to resort to a dictionary, the term "paid" could be read literally to mean what Plaintiffs contend that it means, whereby the average-contribution calculation would only include those years in which Eaton actually paid a contribution. Indeed, Eaton itself appeared to be confused about its obligations under the Term Sheet, as evidenced by its willingness to enter

settlement negotiations concerning its perceived debt. Eaton even wrote a check made out to the Fund for $1,014.00. It provides no explanation for this act, leaving only the reasonable presumption that it too believed it owed Plaintiffs money.

In any event, this Court must read the term "paid" in conjunction with the whole contract, and specifically in conjunction with the remainder of Section E(2). Thus, immediately following the language describing Eaton's obligations under Section E(2), is the phrase "Minimum Payment Obligation." (See Term Sheet, *supra*, p. 2.) The logical conclusion to be drawn from this language is that this terminology serves to define Section E(2). As such, just as is written, Section E(2) is meant to provide a *minimum* contribution from Eaton. There would be no need for this language if there was no minimum contribution, or, in other words, if in some years, some employers like Eaton were required to pay nothing. Any other reading would render the phrase entirely superfluous, which is of course contrary to standard contract interpretation policies. See United Techs. Corp., Pratt & Whitney, 230 F.3d at 576 ("In addition, as with all contracts, courts should attempt to read [federal labor contracts] in such a way that no language is rendered superfluous."). The intent of the Section is therefore to spread the liability throughout the employers who contributed to the Fund, each contributing their share. Interpreting this Section to mean that Eaton had no minimum in certain years contravenes its purpose and, perhaps more importantly, reads out a portion of the contract.

Further bolstering this conclusion is § 4224 of ERISA, the provision which authorized the parties to enter into this agreement. It states in full, "A multi-employer plan may adopt rules providing for other terms and conditions for the satisfaction of an employer's withdrawal liability *if such rules are consistent with this chapter* and with such regulations

as may be prescribed by the corporation." 29 U.S.C. 1404 (emphasis added). There is no dispute that the termination agreement limited Eaton's withdrawal liability. Without it, under ERISA, Eaton's obligations would have totaled $677,777.00. (Johnsen Declaration, ¶ 14.) Instead, the parties negotiated an agreement under § 4224. But that agreement must align with the policies of ERISA and the MPPAA, the latter of which was intended to *"uniformly* impose withdrawal liability and to 'relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.'" Supervalue, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emp'rs Pension Fund, 500 F.3d 334, 336 (3rd Cir. 2007) (quoting H.R. Rep. 869, 96th Cong., 2d Sess., 67, reprinted in 1980 U.S. Code Cong. & Ad. News 2918, 2935) (other internal citation omitted). Generally, this policy, and specifically its purpose of applying liability uniformly, warrant an interpretation of the Term Sheet in which Eaton is required to make yearly minimum contributions.

Consequently, this Court finds that the phrase "yearly contribution paid" contemplates only those years in which Eaton actually made a contribution and, in calculating its obligation under Section E(2), Eaton cannot include years in which it made no payments to the Fund. Because this is a question of law and having found no genuine issue of material fact, Plaintiffs' Motion for Summary Judgment is granted. See Joyfull Int'l Trading Ltd. v. Monkey Bus. LLC, No. 10 Civ. 4692, 2011 WL 4527061, at *4 (S.D.N.Y. Sept. 28., 2011) ("Courts appropriately address questions of law, such as questions of contract interpretation, at the summary judgment stage.").

**D.     2002 Payments**

Eaton argues that any claim concerning missed payments in the year 2002 is barred

by a six-year statute of limitations. See <u>Brennan v. Metropolitan Life Ins. Co.</u>, 275 F. Supp. 2d. 406, 409 (S.D.N.Y. 2003) (holding that although ERISA does not prescribe a statute of limitation for violations of § 1132, "the appropriate statute of limitations is six years -- the limitations period specified in the most analogous state statute") (citing <u>Miles v. New York State Teamsters Conference Pension and Ret. Fund</u>, 698 F.2d 593, 598 (2d Cir.1983)). Plaintiffs do not respond to this argument. Because this claim was filed on July 17, 2009, insofar as Plaintiffs assert a claim arising earlier than July 17, 2003, it is dismissed as time-barred.

**E.     Judgment Award**

Plaintiffs seek attorney fees, liquidated damages, interest, and costs. But with the dispute concerning Eaton's obligations resolved, the parties are encouraged to reach an agreement concerning Eaton's liability. Absent consent, Plaintiff's are directed to file a motion detailing its award request, thereby allowing Eaton to respond to this request, which it has not yet had an opportunity to do.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Docket No. 18) is granted in all respects save their claim for payments due before the statute of limitations expired and Defendant's Motion (Docket No. 20) is denied in all respects with the same exception.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' Motion for Summary Judgment (Docket

No. 18) is GRANTED in part and DENIED in part.

FURTHER, that Defendant's Motion for Summary Judgment (Docket No. 20) is GRANTED in part and DENIED in part.

SO ORDERED.


Dated: January_28, 2012
       Buffalo, New York

                                     /s/William M. Skretny
                                   WILLIAM M. SKRETNY
                                       Chief Judge
                                United States District Court